Russell PETERSON, Jr., Petitioner,

v.

STATE of Alaska, Respondent.

No. S–14233.

Supreme Court of Alaska.

July 20, 2012.

---

Douglas K. Mertz, Mertz Law Office, Juneau, for Petitioner. John M. Ptacin, Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for Respondent.

Justin W. Roberts, Anchorage, Lynn K. Rhinehart, James P. Coppess, and Matthew J. Ginsburg, AFL–CIO, Washington, D.C., and Michael Rubin, Altshuler Berzon LLP, San Francisco, California, for Amicus Curiae AFL–CIO.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

*OPINION*

WINFREE, Justice.

## I. INTRODUCTION

A State of Alaska employee was discharged. With union representation, the employee challenged his termination in grievance proceedings; he was unsuccessful. When he later filed suit for wrongful termination, the State subpoenaed the union representative to appear for a deposition with the union's grievance file. The superior court denied the employee's privilege-based request for a protective order. We granted the employee's petition for review to consider whether a union-relations privilege exists in Alaska. We conclude the privilege exists by implication of Alaska statutes, and we therefore reverse the superior court's ruling and remand for application of the privilege to the discovery dispute.

## II. FACTS AND PROCEEDINGS

Russell Peterson, Jr. began working for the Alaska Department of Labor in 2007. He became a member of the Alaska State Employees Association (ASEA) union. In 2009 he requested service time credit for a previous period of employment with the State; while investigating his request the

State discovered Peterson's 2007 job application did not disclose a previous felony. The State subsequently terminated Peterson's employment.

Peterson filed a grievance under ASEA's collective bargaining agreement (CBA) with the State. The CBA states only the union, and not private counsel, may represent an employee in the grievance process.[1] A non-lawyer ASEA representative handled Peterson's grievance. The ASEA representative communicated with Peterson's attorney, Douglas Mertz, regarding strategy. ASEA and the State were unable to resolve Peterson's grievance and ASEA decided not to pursue arbitration. Peterson then filed suit in superior court for wrongful termination.

The State subpoenaed the ASEA representative to appear for a deposition with the union grievance file pertaining to Peterson, including all written communication between ASEA and Mertz. Peterson sought a protective order on privilege grounds. The superior court denied the motion, holding that any attorney-client privilege covering Mertz's letters was waived by giving the letters to the union and that there was no basis for recognizing a new union-relations privilege.

Peterson petitioned for review of the superior court's order. We granted the petition, directing the parties to address: (1) the applicability, if any, of existing privileges; (2) this court's authority, outside of its rulemaking authority, to judicially recognize new privileges; (3) any relevant privileges adopted by other jurisdictions; and (4) relevant due process concerns. In addition to the parties' briefs, the American Federation of Labor and Congress of Industrial Organizations (AFL–CIO) filed an amicus curiae brief supporting Peterson.

## III. STANDARD OF REVIEW

 Discovery rulings are generally reviewed for abuse of discretion,[2] but whether a privilege applies is a question of law we review independently.[3] Whether a new privilege may be recognized is a pure question of law reviewed de novo,[4] and we will "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[5]

## IV. DISCUSSION

### A. Existing Privilege

The only existing privilege arguably protecting the confidentiality of ASEA's conversations with Peterson or his attorney is the attorney-client privilege of Alaska Evidence Rule 503.[6] But the attorney-client privilege alone does not protect the grievance file or ASEA's communications with Peterson or Mertz because Alaska Evidence Rule 503's definitions do not extend to union representation.

First, a union representative is not a lawyer's representative, which is defined as "one employed to assist the lawyer in the rendition of professional legal services."[7] A union

1. Section 103 of the CBA indicates who may represent an employee in grievance proceedings: The Employer will not negotiate or handle grievances with any individual or employee organization other than the Union with respect to terms and conditions of employment of bargaining unit members in the [ASEA]. When individuals or organizations other than the Union request negotiations or seek to represent bargaining unit members in grievances or to otherwise represent bargaining unit members in Employer/employee matters, the Employer shall advise them that the Union is the exclusive representative for such matters. Similarly, the Union will so advise individuals or organizations making such requests.

2. *Christensen v. NCH Corp.*, 956 P.2d 468, 473 (Alaska 1998).

3. *Jones v. Jennings*, 788 P.2d 732, 735 (Alaska 1990).

4. *See, e.g., Doe v. Alaska Superior Court, Third Judicial Dist.*, 721 P.2d 617, 622–26 (Alaska 1986) (recognizing as a matter of law executive privilege for governor).

5. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

6. Alaska R. Evid. 503(b) (providing client with "privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client"). The Evidence Rules also provide physician-patient, psychotherapist-patient, husband-wife, and clergymen communications privileges. *See* Alaska R. Evid. 504–506.

7. Alaska R. Evid. 503(a)(4).

representative is the only person representing a union employee during the grievance proceedings.[8] The union representative at most will communicate and confer with private counsel, not assist private counsel.

Second, a union representative is not exclusively an employee's representative. Although personally representing an employee during the grievance proceedings, a union representative is more accurately characterized as a representative of the union collectively, and not of an employee individually.

Accordingly, no evidentiary privilege currently recognized under Alaska law is applicable.

### B. This Court's Authority To Recognize New Privileges

Our authority to recognize new privileges is limited by Evidence Rule 501, which provides that "[e]xcept as otherwise provided by the Constitution of the United States or of this state, by enactments of the Alaska Legislature, or by these or other rules promulgated by the Alaska Supreme Court, no person ... has a privilege." Many other states have adopted similar privilege provisions,[9] limiting recognition of privileges "unless adopted by the legislature or a supreme court rule, or required by the state or federal constitution." [10]

For example, in *Doe v. Alaska Superior Court, Third Judicial District* we recognized an executive privilege for the governor in the discharge of official duties.[11] Although we did not address the limitations of Rule 501, we found the separation of powers principle implicit in the Alaska Constitution and concluded it provided the basis for a limited executive privilege.[12]

Whether we recognize a union-relations privilege therefore depends on whether its basis can be found in statutes, the rules of this court, or the constitution.

### C. Relevant Privileges Adopted By Other Jurisdictions

#### 1. *Cook Paint & Varnish Co.*

The National Labor Relations Board (NLRB) has held an employer's demand to discover grievance-related confidential communications between an employee and his union representative interferes with the employee's right to union representation. In *Cook Paint & Varnish Co.* an employee was discharged for his involvement in a paint spill.[13] The union filed a grievance on the employee's behalf.[14] The grievance proceeded according to the collective bargaining agreement, with the union steward involved in all steps of the process.[15] The union then invoked binding arbitration.[16] Two weeks before arbitration the steward was called into a meeting with management personnel and told they wished to question him regarding the incident, threatening disciplinary action if he refused to cooperate.[17] The steward answered under protest, but refused to produce his notes about the incident because they were part of his union notebook.[18]

The NLRB found the steward's involvement arose solely from his union official status, noting he was neither an eyewitness to the incident nor involved because of his own

---

8. *See* note 1, above.

9. *See* EDWARD J. IMWINKELRIED, THE NEW WIGMORE: EVIDENTIARY PRIVILEGES § 4.3.1, at 277–78 n. 38 (2d ed. 2009) (listing Arizona, Florida, Hawaii, Idaho, Maine, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Dakota, Oklahoma, South Dakota, Texas, and Wisconsin as adopting similar privilege statutes).

10. *In re Imposition of Sanctions in Alt v. Cline*, 224 Wis.2d 72, 589. N.W.2d 21, 27 (1999) (interpreting WIS. STAT § 905.01, which states no privilege exists "[e]xcept as provided by or inherent or implicit in statute or in rules adopted by the supreme court or required by the constitution of the United States or Wisconsin").

11. 721 P.2d 617, 623 (Alaska 1986).

12. *Id.* at 623–25.

13. 258 N.L.R.B. 1230 (1981).

14. *Id.*

15. *Id.* at 1231.

16. *Id.*

17. *Id.*

18. *Id.*

misconduct.[19] "Having determined that [the steward's] involvement in the incident arose and continued in the context of his acting as [the employee's] representative," the NLRB ruled Cook Paint's "questioning exceeded permissible bounds, pried into protected activities, and, accordingly, constituted an unlawful interference with employee Section 7 rights [of self-organization]."[20] The NLRB stated that "consultation between an employee potentially subject to discipline and his union steward constitutes protected activity in one of its purest forms."[21] It then explained the probe had "cast a chilling effect over all of [Cook Paint's] employees and their stewards":

> To allow [Cook Paint] here to compel the disclosure of this type of information under threat of discipline manifestly restrains employees in their willingness to candidly discuss matters with their chosen, statutory representatives. Such actions by [Cook Paint] also inhibit stewards in obtaining needed information from employees since the steward knows that, upon demand ... he will be required to reveal the substance of his discussions or face disciplinary action himself.[22]

The NLRB specifically noted that not all discussions between employees and stewards are confidential and protected by the National Labor Relations Act (NLRA).[23] It limited the union-relations privilege to situations in-volving a steward's representational status and overreaching questioning.[24]

### 2. *City of Newburgh v. Newman*

A New York court reached a similar outcome in *City of Newburgh v. Newman*.[25] The Public Employment Relations Board had ruled the City engaged in an improper employment practice when its police commissioner ordered the police union president to answer questions regarding observations of a union member.[26] The union member had sought the union president's advice and assistance concerning disciplinary charges.[27] The court stated:

> Questioning of a union official as to his observations and communications with a union member facing disciplinary proceedings, if permitted, would tend to deter members of the union from seeking advice and representation with regard to pending charges, thereby seriously impeding their participation in an employee organization.[28]

The court affirmed the Board's finding of improper employment practice by the City on the basis of a statute providing union member privileges similar to those under the NLRA.[29]

Responding to an argument that its decision created a common law privilege on par

---

19. *Id.*

20. *Id.* at 1232. Section 7 of the National Labor Relations Act provides:

 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection....
 29 U.S.C. § 157 (2006).

21. 258 N.L.R.B. at 1232.

22. *Id.* (footnote omitted).

23. *Id.*

24. *Id.* Section 8(a)(1) of the NLRA provides that "[i]t shall be an unfair labor practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7]." 29 U.S.C. § 158(a)(1)

(2006). *See also U.S. Dep't of Treasury Customs Serv. v. Nat'l Treasury Emps. Union*, 38 F.L.R.A. 1300, 1990 WL 259712 (1991) (finding employer violated employee's union rights by threatening an employee, who was also a union representative, with disciplinary action if he did not provide information regarding communications with another employee while acting in union representative capacity).

25. 70 A.D.2d 362, 421 N.Y.S.2d 673 (1979).

26. *Id.* at 674.

27. *Id.*

28. *Id.* at 675–76.

29. *Id.* at 675 (citing N.Y. Civ. Serv. Law § 209–a(1)(a) ("It shall be an improper practice for a public employer or its agents deliberately ... to interfere with, restrain or coerce public employees in the exercise of their [union] rights....")).

with the attorney-client privilege, the court stated:

> Any privilege established by the decision of the board is strictly limited to communications between a union member and an officer of the union, and operates only as against the public employer, on a matter where the member has a right to be represented by a union representative, and then only where the observations and communications are made in the performance of a union duty.[30]

### 3. *Seelig v. Shepard*

In *Seelig v. Shepard*[31] a New York court considered the breadth of communications covered by the union-relations privilege recognized in *City of Newburgh*. A New York City commissioner investigating corrections officers had served a subpoena on the corrections officers' union president seeking information about labor-relations communications the president had with union members; the union moved to quash the subpoena.[32]

The court denied the application to quash, concluding that the union-relations privilege adequately protected the union president's "legitimate concern for the confidentiality of internal Union communications on matters concerning labor relations."[33] Analogizing to the attorney-client privilege, the court stated the privilege was not absolute and that communications by union members or representatives to those outside the union were not protected.[34]

### D. Union–Relations Privilege In Alaska

Peterson argues employment is a right and "a public employer may not deprive an employee of that right without due process." Because the CBA provides that only a union representative may represent a union employee in grievance proceedings, Peterson argues an employee's expectation of confidentiality, inherent in the due process right

to counsel, should extend to grievance proceedings. The State replies there was no threat to due process rights because Peterson was being "afforded a fair trial on his claims in superior court."

AFL–CIO contends that "[a] public employer's demand to discover confidential communications between an employee and his union representative made during the mandatory grievance and arbitration process interferes with the employee's right to union representation in violation of the Alaska Public Employment Relations Act (PERA)." AFL–CIO argues that a statutory-based union-relations privilege protecting grievance-related communications between employees and their union representatives should be recognized to "harmonize PERA's strong public policy in favor of contractual resolution of labor disputes with the civil discovery rules' presumption in favor of disclosure." It further argues that such a privilege is necessary to the union's role in the grievance process: "The proper functioning of PERA's mandatory grievance and arbitration system . . . requires[ ] some protection for . . . 'confidential communications made for the purpose of facilitating the rendition of [grievance-related representative] services to the [employee].' "

At oral argument before us the State argued that PERA does not create a union-relations privilege, noting a California court's similar conclusion in *American Airlines, Inc. v. Superior Court*.[35] The State also contended there was no need for grievance-related communications to remain confidential subsequent to the grievance process.

We do not need to address whether a union-relations privilege is required by constitutional due process principles—we agree with AFL–CIO and find the privilege implied in our statutes. PERA states that "the enactment of positive legislation establishing guidelines for public employment relations is

---

**30.** *Id.* at 676.

**31.** 152 Misc.2d 699, 578 N.Y.S.2d 965 (N.Y.Sup. 1991).

**32.** *Id.* at 966–67.

**33.** *Id.* at 967–68.

**34.** *Id.* at 968.

**35.** 114 Cal.App.4th 881, 8 Cal.Rptr.3d 146 (2003).

the best way ... to provide a rational method for dealing with disputes and work stoppages."[36] It expressly recognizes "the right of public employees to organize for the purpose of collective bargaining,"[37] including the rights to "self-organize and form, join, or assist an organization to bargain collectively through representatives of their own choosing, and engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection."[38] Similar to Section 8 of the NLRA, PERA establishes certain unfair labor practices and provides that a public employer "may not (1) interfere with, restrain, or coerce an employee in the exercise of the employee's rights guaranteed in AS 23.40.080; [or] (2) dominate or interfere with the formation, existence, or administration of an organization."[39]

Implicit in Alaska's public union statutory rights is the right of the union and its members to function free of harassment and undue interference from the State.[40] As the New York court in *Seelig* explained, this includes the right to confidential communications with union representatives regarding labor disputes and grievances:

> If unions are to function, leaders must be free to communicate with their members about the problems and complaints of union members without undue interference. Members must be able to have confidence that what they tell their representatives on such subjects cannot be pried out of the representatives by an overzealous governmental agency. Union members must

know and be secure in feeling that those whom they elect from among their ranks will be their spokespersons and representatives, not the unwilling agents of the employer.[41]

As with attorney-client relationships, there is a strong interest in encouraging employees to communicate fully and frankly with their union representative.[42] Frank communication ensures the employee receives accurate advice and meaningful and effective union representation.

Any attempt by the State to force disclosure of confidential communications between an employee and a union representative *during* a grievance proceeding would constitute an unfair labor practice.[43] Such interference "would tend to deter members of the union from seeking advice and representation ... thereby seriously impeding their participation in an employee organization."[44] We believe the protection against forced disclosure of confidential union-related communications should not be lost if the grievance dispute is not resolved and the employee files a civil suit, otherwise the statutory protection is greatly undermined. Based on the strong interest in confidential union-related communications and the statutory protection against unfair labor practices, we hold PERA impliedly provides the State's union employees a union-relations privilege.

We find the State's reliance on *American*

---

**36.** AS 23.40.070.

**37.** AS 23.40.070(1).

**38.** AS 23.40.080.

**39.** AS 23.40.110.

**40.** *See* AS 23.40.110(a)(1)-(2).

**41.** *Seelig v. Shepard*, 152 Misc.2d 699, 578 N.Y.S.2d 965, 967 (N.Y.Sup.1991).

**42.** *See Houston v. State*, 602 P.2d 784, 790 (Alaska 1979) ("The attorney-client privilege ... rests on the theory that encouraging clients to make the fullest disclosure to their attorneys enables the latter to act more effectively, justly and expeditiously...." (quoting *United States ex rel. Edney v. Smith*, 425 F.Supp. 1038, 1046 (E.D.N.Y. 1976))); *see also Cool Homes, Inc. v. Fairbanks*

*N. Star Borough*, 860 P.2d 1248, 1261 n. 22 (Alaska 1993) (quoting *Sacramento Newspaper Guild v. Sacramento Cnty. Bd. of Supervisors*, 263 Cal.App.2d 41, 69 Cal.Rptr. 480, 489 (1968)):

> The privilege against disclosure is essentially a means for achieving a policy objective of the law. The objective is to enhance the value which society places upon legal representation by assuring the client full disclosure to the attorney unfettered by fear that others will be informed.... If client and counsel must confer in public view and hearing, both privilege and policy are stripped of value.

**43.** *See* AS 23.40.110; *see also Seelig*, 578 N.Y.S.2d at 967.

**44.** *City of Newburgh v. Newman*, 70 A.D.2d 362, 421 N.Y.S.2d 673, 675–76 (1979).

*Airlines, Inc. v. Superior Court*[45] misplaced—it presented different circumstances under different law and lends no assistance to our consideration of a union-relations privilege. In *American Airlines* an airline employee, whose union was formed under the federal Railway Labor Act (RLA), was discharged.[46] The employee grieved his termination, with a union official investigating the grievance and assisting him in the grievance process.[47] After the employee's grievance was denied, he filed suit against the airline and a number of his supervisors, alleging illegal discrimination.[48] The employee identified the union official who had assisted him as someone with knowledge supporting his claims.[49] The union official testified at a deposition that: (1) he regularly heard other airline employees use racially derogatory names towards the terminated employee and he could identify those employees; (2) six union stewards had told him they were actively retaliated against by the airline; and (3) the airline coerced employees into giving statements and testifying in favor of the airline and against the terminated employee during the grievance proceedings.[50] But the union official refused to identify any of the persons or provide further details, claiming a union-relations privilege for his communications with the union members who gave him information.[51]

The trial court denied a motion to compel the union official to provide more information, stating that "there ... should be a privilege as to communications between a union officer and members."[52] The appellate court reversed, first concluding that California's Evidence Code did not provide for a union-relations privilege.[53] It then rejected the union's argument that a privilege may be implied whenever a state or federal statute allows employees to have lay representatives.[54] Noting that no court had ever found a union-relations privilege under the RLA, the court rejected the union's reliance on the NLRB's decision in *Cook Paint & Varnish Co.*, explaining that: (1) *Cook Paint* interpreted the NLRA, not the RLA, and presented a narrow holding regarding efforts to interrogate a union official about an upcoming arbitration; and (2) in contrast, the union official in the airline case was "a percipient witness to allegedly discriminatory conduct that he has observed over a four-year time period; nor was he threatened with adverse job action."[55] Finally, the court declined to find a union-relations privilege in state and federal labor statutes giving airline employees rights to self-organize and be free from employer interference or restraint.[56]

The differences between *American Airlines* and this case are substantial and significant. First and foremost, this case involves public employment covered by PERA; *American Airlines* did not. Second, this case involves only confidential communications between an employee (and his attorney) and his union representative in connection with a grievance process; *American Airlines* focused broadly on communications between a union official and other union employees, not communications between a union employee and his union representative regarding the grievance process. Finally, the union-relations privilege protects confidential communications, not facts or unrelated observations; the union official in *American Airlines* was in most respects a percipient witness to events relevant to the terminated employee's claims. In short, *American Airlines* does not provide sufficient grounds to reject the

---

45. 114 Cal.App.4th 881, 8 Cal.Rptr.3d 146 (2003).

46. *Id.* at 148–49.

47. *Id.* at 149.

48. *Id.* at 148–49.

49. *Id.*

50. *Id.* at 149.

51. *Id.*

52. *Id.* at 150.

53. *Id.* at 150–51.

54. *Id.* at 151–53 (rejecting an extension of *Welfare Rights Org. v. Crisan*, 33 Cal.3d 766, 190 Cal.Rptr. 919, 661 P.2d 1073 (1983)).

55. *Id.* at 154–55.

56. *Id.* at 152–54.

limited union-relations privilege we recognize today.

█ The union-relations privilege we recognize today under PERA extends to communications made: (1) in confidence; (2) in connection with representative services relating to anticipated or ongoing disciplinary or grievance proceedings; (3) between an employee (or the employee's attorney) and union representatives; and (4) by union representatives acting in official representative capacity.[57] The privilege may be asserted by the employee or by the union on behalf of the employee.[58] Like the attorney-client privilege, the union-relations privilege extends only to communications, not to underlying facts.[59]

█ We emphasize that the expectation of confidentiality is critical to the privilege because without it "union members would be hesitant to be fully forthcoming with their representatives, detrimentally impacting a union representative's ability to advise and represent union members with questions or problems." [60] Thus, "[a]bsent an expectation of confidentiality, there is little need to protect the communications." [61] We also emphasize that the privilege is only applicable when the union representative is acting in an official union role because "[p]rotecting informal conversations would extend the privilege too far, unnecessarily burdening the search for truth." [62]

## V. CONCLUSION

We recognize the union-relations privilege described above, REVERSE the superior court's discovery ruling, and REMAND for further proceedings consistent with this opinion.

---

57. *See Bell v. Vill. of Streamwood*, 806 F.Supp.2d 1052, 1056 (N.D.Ill.2011). Like the attorney-client privilege, the union-relations privilege protects communications between union representatives and an employee's attorney. *See* Alaska Evid. R. 503(b).

58. Because Peterson claimed the privilege, we have no occasion to address whether the union has a right to claim the privilege on its own behalf.

59. *See Upjohn Co. v. United States*, 449 U.S. 383, 395, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (holding attorney-client privilege protects disclosure of communications but does not protect client from disclosure of underlying facts). For exam-

ple, the State argues the union-relations privilege "would undermine the exhaustion doctrine by making it impossible for an employer to prove that an employee failed to exhaust the grievance process provided by a collective bargaining agreement." Because facts, such as whether Peterson exhausted the grievance process or attempted to, are not protected by the union-relations privilege, the State's concern is without merit.

60. *Bell*, 806 F.Supp.2d at 1057.

